**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**MARCELLO AIELLO; EDWARD BREEDEN**
**JUSTIN DANIELS; GERALD KROUTH;**
**BENJAMIN MADDEN; KOREY MAXSON;**
**MAURICE MIMS; JOSEPH ROESCH;**
**GLENN THOMAS; PAUL VANDERPOOL,**

                                    **Plaintiffs,**

        **vs.**

                                                        **9:16-CV-53**
                                                        **(MAD/CFH)**


**TIMOTHY LAMITIE,** *Acting Director, Central*
*NY Psychiatric Center*; **LUCY DAWES,** *Treatment*
*Team Leader*; **CHARMAINE BILL,** *Treatment*
*Team Leader*; **MARK CEBULA,** *Treatment Team*
*Leader*; **EMILY GRAY,** *Social Worker II*; **SCOTT**
**ASHLEY,** *Supervising Secure Care Treatment Aide*;
**ROBERT TAYLOR,** *Supervising Secure Care Treatment*
*Aide*; **MICHAEL FAIRBROTHERS,** *Supervising Secure*
*Care Treatment Aide*; **MATTHEW COOK,** *Supervising*
*Secure Care Treatment Aide*; **KENNETH WILLIAMS,**
*Secure Care Treatment Aide*; **BRIAN BUMBOLO,**
*Supervising Secure Care Treatment Aide; CNYPC*;
**TIMOTHY HYDE,** *Supervising Secure Care Treatment*
*Aide; CNYPC*; **DAVID PARRISH,** *Supervising Secure*
*Care Treatment Aide; CNYPC*; **ERIC FICAL,** *Supervising*
*Secure Care Treatment Aide; CNYPC*,

                                    **Defendants.**

_____

**APPEARANCES:**                    **OF COUNSEL:**

**HARRIS, BEACH LAW FIRM –**        **ELLIOT A. HALLAK, ESQ.**
**ALBANY OFFICE**                   **DANIEL R. LECOURS, ESQ.**
677 Broadway                        **KELSEY HANSON, ESQ.**
Suite 1101                          **MEAGHAN FEENAN, ESQ.**
Albany, New York 12207
Attorneys for Plaintiffs

**HARRIS, BEACH LAW FIRM –**        **BRIAN D. ROY, ESQ.**
**SYRACUSE OFFICE**

333 West Washington Street – Suite 200
Syracuse, New York 13202
Attorneys for Plaintiffs

**NEW YORK STATE ATTORNEY**    **ANDREW W. KOSTER, AAG**
**GENERAL – ALBANY**    **CHRISTOPHER LIBERATI-CONANT,**
The Capitol    **AAG**
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs Marcello Aiello, Edward Breeden, Korey Maxson, Justin Daniels, Maurice

Mims, Glenn Thomas, Joseph Roesch, Gerald Krouth, Paul Vanderpool, and Benjamin Madden

commenced this action on January 15, 2016, alleging various violations of New York State mental

hygiene laws. *See* Dkt. No. 1. On May 24, 2016, Plaintiffs filed an amended complaint alleging

various violations of their constitutional rights. *See* Dkt. No. 23. On October 10, 2017, pro bono

counsel was appointed to represent Plaintiffs. *See* Dkt. No. 67. On April 18, 2018, Plaintiffs filed

a second amended complaint alleging various constitutional violations. *See* Dkt. No. 84.

Following the filing of a motion to dismiss, Plaintiffs filed a third amended complaint, which is

the operative pleading. *See* Dkt. Nos. 104, 113. In the third amended complaint, Plaintiffs allege

(1) wrongful detention pursuant to the Fourteenth Amendment, (2) medical indifference pursuant

to the Eighth and/or the Fourteenth Amendment, (3) violations of the First Amendment, and (4)

retaliation pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 113 at ¶¶ 175-212. On September 16,

2019, a trial date was set for March 16, 2020. *See* Dkt. No. 137. On December 9, 2019,

Defendants moved for summary judgment. *See* Dkt. No. 148. Plaintiffs responded in opposition

to the motion for summary judgment and cross-moved to amend the complaint and add new

parties. *See* Dkt. No. 153. Currently before the Court are Defendants' motion for summary judgment and Plaintiffs' cross motion for leave to amend their complaint. *See* Dkt. Nos. 148, 153.

## II. BACKGROUND

This litigation arises out of an incident that occurred while Plaintiffs were confined in the Central New York Psychiatric Center's ("CNYPC") Sex Offender Treatment Program ("SOTP"). *See* Dkt. No. 113 at ¶¶ 2, 7-16. At all relevant times, Plaintiffs were civilly confined in CNYPC's SOTP pursuant to Article 10 of the New York State Mental Hygiene Law. *See* Dkt. No. 148-2 at ¶¶ 1-2. While confined, Plaintiffs became discontent following two incidents in which CNYPC staff miscounted utensils in the dining hall. *See id.* at ¶ 2. On October 23, 2015, and October 26, 2015, CNYPC staff, believing utensils to be missing from the dining hall, locked down and searched the ward on which Plaintiffs resided. *See id.* at ¶¶ 27-31, 37. During the lock downs residents on the ward, including Plaintiffs, were required to stay in their rooms and were only allowed to use the bathroom after being frisked. *See id.* at ¶¶ 32, 41.

## A.      Central New York Psychiatric Center's Sex Offender Treatment Program

Individuals "found to be a dangerous sex offender requiring confinement [are] committed to a secure treatment facility." N.Y. C.L.S. Men. Hyg. § 10.10(a). Such individuals are sent to treatment facilities such as CNYPC.[1] *See* Dkt. No. 148-2 at ¶ 2. "The primary mission of the

---

[1] The Court notes that Plaintiffs have denied almost all of Defendants' statement of material facts, even facts which are not subject to a genuine dispute. For example, in Defendants' statement of material facts, they claim that "[a]nti-social behaviors (including actions which disrupt facility operations) and acts of physical aggression, or the direct threat of such, can lead to placement on MOD status." *See* Dkt. No. 148-2 at ¶ 14. In denying this fact, Plaintiffs refer the Court to "CNYPC's written policy for an accurate description CNYPC's MOD Program." *See* Dkt. No. 153-15 at ¶ 14 (citing Dkt. No. 149-2). The documents to which Plaintiffs cite in the denial states that MOD restrictions "are implemented following antisocial, potentially criminal, or aggressive behaviors that place the safety, security, and welfare of other residents and staff at risk." *See* Dkt. No. 149-2 at 1. In another paragraph, Defendants claim that "Plaintiff Daniels

(continued...)

SOTP is to provide secure custody, care, and treatment to persons adjudicated by the courts as requiring civil management in an in-patient setting pursuant to Article 10 of the New York State Mental Hygiene Law. " *See id.* "Treatment services, targeted at reducing the resident's risk of sexually re-offending, are designed to enhance the individual's treatment engagement, develop self-regulation skills to manage sexual deviancy, and to assist the individual in developing pro-social attitudes and behaviors." *See id.* at ¶ 5. Providing a safe and secure treatment environment is vital to the success of the SOTP. *See id.* at ¶ 6.

## B.   The MOD Ward

The Motivation on Deck ("MOD") Program is "a tool designed to decrease aggressive and impulsive behaviors while increasing motivation to engage in traditional tracks of the CNYPC SOTP." *See* Dkt. No. 148-2 at ¶ 9. While on MOD status, a resident is subject to greater restrictions than the general SOTP population, but it is not utilized as a form of punishment. *See id.* at ¶ 11. Pursuant to the policy in effect at the time, there are three types of MOD: Program MOD, Unit MOD, and Room MOD. *See* Dkt. No. 148-2 at ¶ 16. Plaintiffs were placed on Room MOD status.[2] *See* Dkt. No. 148-2 at ¶ 38; Dkt. No. 149 at ¶¶ 16-25. "Room MOD is intended as

---

[1](...continued)
yelled things like 'I'm not scare of none of ya'll. You aint' gonna touch me, I wanna see someone touch me." *See* Dkt. No. 148-2 at ¶ 31. Plaintiffs deny this allegation, arguing that "Plaintiff Daniels did not respond violently or in a threatening manner. Plaintiff Daniels was frustrated that . . . he was not being allowed to leave the cafeteria despite having turned in his utensils[.] Daniels kicked a chair out of frustration, which moved just a few feet and was not directed at any person." *See* Dkt. No. 153-15 at ¶¶ 31, 35. A review of the surveillance footage of the incident shows Plaintiff Daniels making those exact statements and kicking a chair across the room. *See* Dkt. No. 152 at 58:30-59:42. Plaintiffs' response to Defendants' statement of material fact is filled with similarly unsupported denials. Although the Court relies upon paragraphs of the statement of material facts that Plaintiffs made similar objections to, the Court will not explain why reliance upon each fact is appropriate despite Plaintiffs' unsupported denials.

[2] Defendants claim that Plaintiff Vanderpool was placed on Program MOD rather than

(continued...)

a response to purposeful conduct that poses a risk of serious, impending danger to the facility, particularly that which has reasonable potential to become pervasive throughout the secure treatment facility." *See* Dkt. No. 149-2 at 3. Additionally, Room MOD is used as a "safety intervention utilizing behavior management techniques for the purpose of modifying, altering, or controlling a resident's disruptive or antisocial behavior." *Id.* at 4.

## C. Altercation with CNYPC Staff – October 27, 2015

On the morning of October 27, 2015, residents, including Plaintiffs, gathered in the dining hall for breakfast. *See* Dkt. No. 148-2 at ¶ 23. Plaintiffs Aiello, Breeden, Krouth, Maxson, Mims, Roesch, and Vanderpool, believing that it was the responsibility of CNYPC staff to pick up food trays, did not return their trays and utensils to the counter after completing their meal. *See id.* Plaintiffs Madden, Daniels, and Thomas, however, returned their trays and utensils to the counter. *See id.* at ¶ 24. Some time after residents had finished breakfast, staff told them that they were not allowed to leave until all of the silverware was turned in. *See id.* Plaintiff Madden then began to confront staff, stating, among other things, "what are you going to (unintelligble) fake MOD." *See* Dkt. No. 152 at 35:30-36:00. At approximately 9:30 a.m., staff began to announce the names of residents who could leave the dining hall. *See* Dkt. No. 148-2 at ¶ 29. During this process, Plaintiffs Thomas and Daniels became agitated. Plaintiff Thomas can be heard repeatedly using the word "motherfucker," saying "fuck you" to Defendant Ashley, and calling an unknown individual a "bitch." *See* Dkt. No. 152 at 47:10-48:00. Plaintiff Thomas paced around the dining hall saying things such as "I ain't gonna do shit you want me to do." *See id.* at 49:30-51:00.

---

[2](...continued)
Room MOD. *See* Dkt. No. 149 at ¶ 25. However, because Plaintiff Vanderpool was moved to ward 504, Plaintiffs disagree. *See* Dkt. No. 153-15 at ¶ 88. As discussed below, this disagreement does not alter the outcome of the present motions.

Around the same time, Plaintiff Daniels became aggressive, yelling things such as "I'm not scared of none of ya'll," "I wanna see someone touch me," and "this is going to be the day I go back to DOCCS." *See id.* at 59:19-59:42. Plaintiff Daniels then kicked over a chair. *See id.* at 58:30. Plaintiffs were the only residents not permitted to leave the dining hall. *See* Dkt. No. 153-15 at ¶¶ 28, 34, 35, 38.

After some time, CNYPC staff collected the remaining trays and told Plaintiffs that they would be sent to ward 504, which was opened as a temporary Motivation on Deck ("MOD") ward. *See* Dkt. No. 148-2 at ¶ 38. When initially asked if anyone wanted to go to the MOD ward, Plaintiff Madden agreed. *See id.* at ¶ 40. Soon after, Plaintiffs Krouth, Thomas, Daniels, and Mims agreed to go to the MOD ward. *See* Dkt. No. 148-2 at ¶ 41. At approximately 10:30 a.m., Plaintiff Maxson told staff that he needed to use the bathroom. *See* Dkt. No. 148-2 at ¶ 43. CNYPC staff told Plaintiff Maxson that he could use the bathroom in the MOD ward. *See id.* at ¶ 44. A few minutes later, Plaintiff Maxson asked staff if they wanted him to defecate in the dining hall, to which staff responded "no, we want you to go in 504. If you choose to defecate in this room that's on you." *See id.* at ¶¶ 47-49. Plaintiff Maxson then defecated in a corner of the dining hall. *See id.* at ¶ 49. A few hours later, Plaintiffs Roesch and Maxson urinated in the same corner. *See id.* at ¶¶ 50, 51-52. At approximately 1:30 p.m., Plaintiff Breeden agreed to go to the MOD ward. *See id.* at ¶ 53. At approximately 3:00 p.m., new staff members arrived and, after some discussion, the remaining Plaintiffs agreed to go to the MOD ward. *See id.* at ¶ 54-55. Throughout the disturbance in the dining hall, CNYPC staff asked Plaintiffs if they wished to go to the MOD ward approximately every fifteen to thirty minutes. *See id.* at ¶ 57.

Although residents on Room MOD are typically housed in their units, due to the number of individuals being placed on Room MOD, there were security concerns associated with keeping

Plaintiffs in their normal rooms. *See id.* at ¶ 60. Therefore, Jeffrey Nowicki ("Mr. Nowicki"), the Chief of Mental Health Treatment Services for CNYPC's SOTP, obtained approval from Defendant Lamitie to open ward 504 as a temporary MOD ward. *See id.* at ¶ 61. At the time, ward 504 had a substantially similar layout and design as ward 404. *See id.* at ¶ 64. Each room was furnished and had lighting, windows, and an unlockable door with a window. *See id.* at ¶ 65. Every day, the treatment team visited residents. *See id.* at ¶ 66. Residents were given three meals each day and were permitted to shower and use the bathroom. *See id.* at ¶ 67. While on the MOD ward, Plaintiffs were initially confined to their rooms except for thirty minutes each day when they could go to the day room. *See id.* Plaintiff Vanderpool left the MOD ward on October 29, 2015. *See id.* at ¶ 71. Plaintiffs Krouth, Breeden, Madden, Mims, and Thomas left the MOD ward on November 2, 2015. *See id.* at ¶ 72. Plaintiffs Aiello and Daniels left the MOD ward on November 3, 2015. *See id.* at ¶ 73. Plaintiffs Maxson and Roesch left the MOD ward on November 6, 2015. *See id.* at ¶ 74.

## D.     Present Motions

In their motion for summary judgment, Defendants argue that judgment should be entered in their favor as to each claim. *See* Dkt. No. 148-1 at 11-12. As to Plaintiffs' wrongful detention claim, Defendants argue that Mr. Nowicki, not Defendants, made the decision to place Plaintiffs on MOD status, and thus, Plaintiffs cannot establish Defendants' personal involvement. *See id.* at 11. Further, Defendants argue that Plaintiffs were placed on MOD status for legitimate reasons based on the staff's professional judgment. *See id.* Defendant Bill argues that judgment should be entered in her favor as to Plaintiff Vanderpool's First Amendment Free Exercise claim as his rights were not violated because the festival he attempted to attend was for a religion that he does not follow. *See id.* Defendants also argue that judgment should be entered in their favor as to

Plaintiffs Roesch and Madden's medical indifference claims because they cannot satisfy the objective or subjective elements. *See id.* at 12. Finally, Defendants argue that judgment should be entered in their favor on Plaintiffs' retaliation claim because they did not engage in constitutionally protected conduct and the named Defendants did not take any adverse action against them. *See id.*

In their response, Plaintiffs argue that Defendants' motion for summary judgment should be denied because material issues of fact remain. *See* Dkt. No. 153-25 at 7. Regarding their due process claim, Plaintiffs argue that all Defendants were personally involved in improperly placing Plaintiffs on MOD status because all of the Defendants recommended, facilitated, and/or executed the decision to place Defendants on MOD status. *See id.* Plaintiffs Roesch and Madden oppose summary judgment on their medical indifference claims, arguing that Defendants knew, or should have known, that they withheld medically necessary treatment. *See id.* at 7-8. Plaintiff Vanderpool argues that summary judgment on his First Amendment Free Exercise claim is improper because Defendant Bill unjustifiably interfered with the exercise of his sincerely held religious belief. *See id.* at 8. Finally, Plaintiffs oppose summary judgment on their retaliation claim, arguing that CNYPC staff took adverse action against them in retaliation for engaging in protected conduct. *See id.* Plaintiffs have also moved to amend their complaint to add Mr. Nowicki and Christopher Fullem ("Mr. Fullem") as Defendants in this action. *See id.* at 28.

### III. DISCUSSION

**A.     Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quotations omitted).

**B.     Motion to Amend[3]**

According to Rule 15 of the Federal Rules of Civil Procedure, when unable to amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave will only be granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  An amendment of a pleading is considered "futile" when the proposed new claim would not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see also Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 468 (E.D.N.Y. 1998), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).

**C.     42 U.S.C. § 1983**

Section 1983 establishes a civil cause of action for deprivation of a right secured by the Constitution or a federal statute: "Every person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]"  42 U.S.C. § 1983.  In order to state a claim under Section 1983, a plaintiff must show that: (1) "some person has deprived him of a federal right," and (2) "the person who deprived him of that right acted under the color of state . . . law."  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

---

[3] Because the analysis of Plaintiffs' motion to amend is intertwined with Defendants' motion for summary judgment, the Court will address these argument in tandem.

Not only must the conduct deprive the plaintiff of a protected right, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, *reh. denied,* 445 U.S. 920 (1980)). As such, for a plaintiff to recover in a Section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)) (other citation omitted). Additionally, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and other citations omitted).

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citation omitted). The Second Circuit has held that supervisor liability pursuant to Section 1983 can be shown in one or more of the following ways:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Id*.

**D.      Wrongful Detention**

        *1. Placement on MOD Status*

Individuals who have been civilly committed retain substantive due process rights. *See Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg*, 457 U.S. at 320 (quotations omitted). "In seeking this balance[,] . . . the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. "In considering such claims, courts must 'show deference to the judgment exercised by qualified professional[s],' whose decisions are entitled to a 'presumption of correctness.'" *Yeldon v. Hogan*, No. 9:08-CV-769, 2010 WL 983819, *4 (N.D.N.Y. Mar. 15, 2010) (quoting *Youngberg*, 457 U.S. at 322-24).

As a preliminary matter, Defendants argue that Plaintiffs have failed to establish that they have an enforceable liberty interest in avoiding MOD status, and thus, their due process claim must fail. *See* Dkt. No. 155 at 4. As Defendants correctly note, courts in this circuit have repeatedly found that placement on MOD status at CNYPC does not implicate the Due Process Clause. *See* Dkt. No. 155 at 4; *see also Groves v. New York*, No. 9:09-CV-412, 2010 WL 1257858, *10 (N.D.N.Y. Mar. 1, 2010) (citing *Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996) (holding that civilly confined individuals do not have a right to be placed in the least restrictive appropriate treatment environment)); *Haden v. Hellinger*, No. 9:14-CV-318, 2016 WL 8673144, *13 (N.D.N.Y. Sept. 30, 2016); *June v. Hogan*, No. 9:09-CV-323, 2014 WL 502536 (N.D.N.Y. Feb. 7, 2014); *Yeldon*, 2010 WL 983819, at *4-5; *McChesney v. Hogan*, No. 9:08-CV-163, 2010 WL 3602660, *12 (N.D.N.Y. Aug. 17, 2010). Thus, Plaintiffs have failed to establish

that they have an enforceable liberty interest. However, in the alternative, the Court finds that Plaintiffs have failed to establish the personal involvement of Defendants Dawes, Hyde, Kenneth, Williams, Fairbrothers, Ashley, Parrish, Bumbolo, Cook, Taylor, and Fical.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

Here, the record indicates that Mr. Nowicki was informed of the events taking place in the dining hall by Mr. Fullem and Defendants Bill and Cebula, and that Mr. Fullem and Defendant Bill recommended that Plaintiffs be placed on the MOD ward. *See* Dkt. No. 149 at ¶ 2. Mr. Nowicki approved of placing Plaintiffs on the MOD ward and sought permission from Defendant Lamitie to open a temporary MOD ward for this purpose. *See id.*; Dkt. No. 148-21 at ¶ 2. Defendant Lamitie approved this request, but claims that he did not play a role in the decision to place Plaintiffs on MOD status. *See* Dkt. No. 148-21 at ¶ 2. Defendant Gray conducted the initial MOD placement reviews for Plaintiffs. *See* Dkt. Nos. 149-3, 149-4, 149-5, 149-6, 149-7, 149-8, 149-9, 149-10, 149-11. While this record may be sufficient to allege personal involvement of Defendants Gray, Lamitie, Cebula, Bill, Mr. Fullem, and Mr. Nowicki, the allegations are insufficient as to the remaining Defendants. Plaintiffs do not contest these facts, but rather contend that the words and conduct of Defendants Dawes, Hyde, Kenneth, Williams, Fairbrothers, Ashley, Parrish, Bumbolo, Cook, Taylor, and Fical caused Plaintiffs to "reasonably fear" that they

would be taken by force to the MOD ward, thereby causing them to agree to go to the MOD ward. *See* Dkt. No. 153-25 at 13. This connection is too tenuous to demonstrate a "tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Accordingly, the Court finds that no reasonable trier of fact could find that Plaintiffs established the personal involvement of Defendants Dawes, Hyde, Kennth, Williams, Fairbrothers, Ashley, Parrish, Bumbolo, Cook, Taylor, and Fical for Plaintiffs' wrongful detention claim.

Regardless, Defendants Gray, Lamitie, Cebula, Bill, Mr. Fullem, and Mr. Nowicki are entitled to summary judgment on Plaintiffs' wrongful detention claim because the decision to place Plaintiffs on MOD status was for legitimate reasons based on professional judgment. The basis of Plaintiffs' wrongful detention claim is that their conduct in the dining hall on October 27, 2015, "simply did not rise to a level that would objectively warrant the most severe administrative sanction permitted under CNYPC's own policy." *See* Dkt. No. 153-25 at 11. Therefore, Plaintiffs argue, MOD placement was improper. *See id.* However, the record is replete with justifications to place Plaintiffs on MOD status.

CNYPC's policy states that "residents who engage in treatment interfering behaviors may experience a loss of privileges or other consequences." Dkt. No. 149-1 at 3. Treatment interfering behaviors include "[u]se of profanity directed at a person, insulting/demeaning language, degrading comments of any kind, or verbal threats[.]" *Id.* at 4. "Residents are asked to follow verbal or written directions from staff[.]" *Id.* at 7. "[R]esidents are not permitted to riot, which includes any time two or more residents are together and cause a disturbance that results in a disruption, destruction or violence." *Id.* "The MOD Program is a component of the clinical treatment of the [Sex Offender Treatment Program] that focuses on stabilizing purposeful

dangerous behaviors[.]" Dkt. No. 149-2 at 1. "Room MOD is intended as a response to purposeful conduct that poses a risk of serious, impending danger to the facility, particularly that which has reasonable potential to become pervasive throughout the secure treatment facility." *Id.* at 3. CNYPC's policy regarding Room MOD states, in relevant part,

> A resident can be placed in Room MOD immediately following any event wherein a resident:
>
> (A) clearly refuses, and is unwilling, to control antisocial behavior;
>
> (B) willfully displays aggressive, potentially criminal, and/or violent behavior that places the safety and welfare of residents and/or staff at risk (examples of such behavior include but are not limited to, concealment or display of weapons, deliberate menacing, gang organization, inciting others to riot, and specific threats or imminent harm) and;
>
> (C) does not provide reasonable assurance to clinical and direct care staff that he is able to interact with other residents and staff without posing a clear assault risk.

Dkt. No. 149-2 at 4.

The incident in the dining hall on October 27, 2015, began when Plaintiffs Aiello, Vanderpool, Maxson, Roesch, Mims, Krouth, and Breeden refused to return their dining trays and utensils to the counter, despite directions from staff. *See* Dkt. No. 148-2 at ¶ 23; *see also* Dkt. Nos. 149-3, 149-4, 149-6, 149-7, 149-9, 149-10, 149-12. After some time, staff told all of the residents that they would only be allowed to leave the dining hall when all of the trays were returned and utensils were accounted for. *See* Dkt. No. 148-2 at ¶ 24. During this time, Plaintiff Madden began to argue with staff. *See* Dkt. No. 152 at 35:30-36:00. Plaintiff Madden escalated the altercation by stating things such as "this wouldn't be going on if your staff didn't keep messing up the count." *See id.* Once staff began to release residents who had returned their trays and utensils, Plaintiffs Thomas and Daniels became agitated. Plaintiff Thomas can be heard

repeatedly using the word "motherfucker," saying "fuck you" to Defendant Ashley, and calling an unknown individual a "bitch." *See* Dkt. No. 152 at 47:10-48:00. Plaintiff Thomas paced around the dining hall saying things such as "I ain't gonna do shit you want me to do." *See id.* at 49:30-51:00. Plaintiff Daniels kicked over a chair. *See id.* at 58:30. Plaintiff Daniels then yelled things such as "I'm not scared of none of ya'll," "I wanna see someone touch me," and "this is going to be the day I go back to DOCCS." *See id.* at 59:19, 59:42. After this conduct, CNYPC staff were justified in placing Plaintiffs Madden, Thomas, and Daniels on MOD status because they refused to follow staff direction, used abusive language, and demonstrated aggressive behavior. *See* Dkt. No. 149-1 at 4-7.

By intentionally disregarding the directions of staff to return their trays, Plaintiffs Aiello, Vanderpool, Maxson, Roesch, Mims, Krouth, and Breeden violated SOTP rules. *See* Dkt. No. 149-1 at 7. Further, Plaintiffs Aiello, Vanderpool, Maxson, Roesch, Mims, Krouth, and Breeden caused a disturbance in the dining hall that resulted in disruption and interfered with treatment. *See id.* Because of Plaintiffs' conduct, CNYPC staff had sufficient justification to place Plaintiffs Aiello, Vanderpool, Maxson, Roesch, Mims, Krouth, and Breeden on MOD status. *See* Dkt. No. 149-1 at 3. Further, Plaintiffs claim that their conduct was "peaceful" is belied by the evidence. As discussed previously, multiple residents were hostile and aggressive during the altercation. Additionally, although Plaintiffs Aiello, Vanderpool, Maxson, Roesch, Mims, Krouth, and Breeden did not explicitly threaten staff, they created an atmosphere of hostility. At one point one Plaintiff stated "[y]ou can only push people so far before shit happens." *See* Dkt. No. 152 at 1:07:10. To which another Plaintiff responded "[e]xactly. (unintelligble) breaking point. Attica remembered that one." *See id.* Plaintiffs then began to discuss a number of violent things that had happened during their incarceration, noting events such as "lockdowns, riots, everything.

Murder." *See id.* at 1:07:28-1:07:35.  Finally, multiple Plaintiffs admitted in their depositions that they were preparing themselves to fight.  *See* Dkt. No. 155-2 at 10; Dkt. No. 155-3 at 10 ("I tucked the hoodie inside the back of it, so it couldn't be grabbed if they decided to get physical").

While the MOD program entails greater liberty restrictions than those imposed upon the general SOTP population, they were not arbitrarily applied.  Rather, it is clear that Plaintiffs' conduct — intentionally disregarding staff direction and displaying hostile behavior — posed a "risk of serious impending danger to the facility" that had the "potential to become pervasive throughout the secure treatment facility."  *See* Dkt. No. 149-2 at 1.  Therefore, Mr. Nowicki, Mr. Fullem, and Defendants Lamitie, Cebula, Bill, and Gray properly exercised professional judgment in placing Plaintiffs on MOD status.  Based on Plaintiffs' conduct, no rational trier of fact could find that the decision to place Plaintiffs in Room MOD was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment."  *Youngberg*, 457 U.S. at 323.  Accordingly, Defendants' motion for summary judgment is granted as to this claim.[4]

### 2. Access to Counsel While on MOD Status

Plaintiffs Breeden, Aiello, Daniels, Maxson, Mims, and Roesch allege that while they were on the MOD ward, they were denied access to counsel and/or legal documents by Defendant Gray.  *See* Dkt. No. 153-3 at ¶¶ 5-6; Dkt. No. 153-5 at 3; Dkt. No. 153-13 at ¶ 186; Dkt. No. 153-16 at ¶ 7; Dkt. No. 153-17 at ¶ 8; Dkt. No. 153-20 at ¶ 8; Dkt. No. 153-21 at ¶ 22.  Plaintiffs bring

---

[4] Plaintiffs' proposed amendment — to include Mr. Nowicki and Mr. Fullem as defendants — would not cure the deficiencies in Plaintiffs' claim.  As discussed, no reasonable trier of fact could find that Mr. Nowicki's and Mr. Fullem's decision to place Plaintiffs on MOD status was "such a substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323.  Accordingly, Plaintiffs motion to amend is denied as futile with respect to this claim.

this claim under the Fourteenth Amendment of the United State Constitution. *See* Dkt. No. 153-13 at 32. In their response to the motion for summary judgment, Plaintiffs correctly note that Defendants did not move for summary judgment on Plaintiffs' alleged violations of their due process rights involving the deprivation of right to counsel. *See* Dkt. No. 153-25 at 13.

"Under Federal Rule of Civil Procedure 56(f), district courts have discretion to grant summary judgment *sua sponte* 'after giving notice and a reasonable time to respond' and 'after identifying for the parties material facts that may not be genuinely in dispute.'" *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 742 F.3d 17, 24 (2d Cir. 2014)(citing Fed. R. Civ. P. 56(f), (f)(3); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). "Before granting summary judgment *sua sponte*, however, a district court 'must assure itself that following the procedures set out in Rule 56(a)-(e) would not alter the outcome.'" *Id.* (citing *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996) (alterations omitted)). "In other words, '[d]iscovery must either have been completed, or it must be clear that further discovery would be of no benefit,' such that 'the record . . . reflect[s] the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" *Id.* (citing *Ramsey*, 94 F.3d at 74).

Here, the Court provided counsel with the opportunity to present evidence and arguments regarding the viability of Plaintiffs' access to counsel claim. *See* Dkt. No. 159. In response, Plaintiffs argue that, because of the denial of access to counsel, by the time Plaintiffs were able to object to their placement on the MOD ward, their objection was moot. *See* Dkt. No. 160-4 at 3. According to Plaintiffs, denial of access to counsel in the days that they were in the MOD ward constitutes prejudice. *See id.* at 3-4. Defendants argue that a temporary inability to access administrative remedies does not constitute denial of access to counsel. *See* Dkt. No. 162 at 3.

However, for the following reasons, summary judgment in Defendant Gray's favor as to Plaintiffs' access to counsel claim is appropriate.

In *Bounds v. Smith*, 430 U.S. 817, 821-23 (1977), the Supreme Court held that prisoners have a constitutional right of access to the courts under the Fourteenth Amendment. *See Morello v. James*, 810 F.2d 344, 346-47 (2d Cir. 1987). The analysis for a denial access to the courts claim is the same for both civilly committed individuals and prisoners. *See Lane v. Carpinello*, No. 9:07-CV-751, 2009 WL 3074344, *24 n.26 (N.D.N.Y. Sept. 24, 2009). To establish a *Bounds* violation, a plaintiff must demonstrate "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). "Thus, to establish a claim of inadequate access to the courts under *Bounds*, an inmate must show 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim' – for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality." *Benjamin v. Fraser*, 264 F.3d 175, 184 (2d Cir. 2001) (quoting *Lewis*, 518 U.S. at 351). "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Brooks v. Creahan*, No. 9:15-CV-90, 2015 WL 13850057, *11 (N.D.N.Y. June 10, 2015) (quotation omitted). "[T]o establish a violation of the right of access to the courts, a plaintiff must demonstrate that a defendants interference caused him or her actual injury – that is, that a 'nonfrivolous legal claim had been frustrated or was being impeded' as a result of the defendant's conduct." *McChesney*, 2010 WL 3602660, at *13 (quoting *Lewis*, 518 U.S. at 353). "To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the court to determine whether the claim had an arguable basis in either law or fact." *See Roesch v. Sullivan*, No. 15-CV-247, 2016 WL 11484171, *10 (S.D.N.Y. Aug. 8, 2016) (citing

*Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("a complaint . . . is frivolous where it lacks an arguable basis either in law or in fact")).

Here, Plaintiffs failed to show that Defendant Gray interfered with Plaintiffs' right of access to the courts.[5] Neither Plaintiffs' complaint, nor the present record, reveal any prejudice resulting from Defendant's alleged denial. *See* Dkt. No. 153-13 at ¶ 186. Here, Plaintiffs claim that they were prejudiced because they were prevented from challenging their placement on MOD status. *See* Dkt. No. 160-4 at 3. However, Plaintiffs were not prevented from challenging their placement on MOD status, as evidenced by the many administrative complaints filed and the filing of this action. *See* Dkt. Nos. 160-1, 160-2, 160-3; *see also Amaker v. Boyd*, No. 9:19-CV-1253, 2020 WL 210317, *6 (N.D.N.Y. Jan. 14, 2020) (noting that "[m]ere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation'"). Additionally, for the reasons detailed above, Plaintiffs' challenge to their placement on MOD status has no basis in law and, therefore, is frivolous.

Further, courts in this district have repeatedly rejected similar unsupported claims of inadequate access to courts by residents at CNYPC. *See, e.g.*, *McChesney*, 2010 WL 3602660, at *12-13 (finding access to court claim by a CNYPC resident involving restrictions on access to legal materials and on outside communications with lawyers insufficient because the plaintiff failed to demonstrate prejudice); *June v. Blair*, No. 9:09-CV-323, 2010 WL 8522831, *15 (N.D.N.Y. Sept. 30, 2010) *rep. rec. adopted in part and rejected inpart on other grounds by June*

---

[5] To the extent that Plaintiffs' claims are brought pursuant to the Sixth Amendment, they would still fail because the right to counsel under the Sixth Amendment extends only to criminal proceedings. *See Groves v. New York*, No. 9:09-CV-412, 2010 WL 1257858, *11 (N.D.N.Y. Mar. 1, 2010) (quoting *In re Martin-Trigona*, 737 F.2d 1254, 1260 (2d Cir. 1984)). Because placement on MOD status is not a criminal proceeding, the claim would fail under the Sixth Amendment. *See id.*; *see also Balkum v. Sawyer*, No. 6:06-CV-1467, 2011 WL 5041206, *9 (N.D.N.Y. Oct. 21, 2011).

*v. Blair*, No. 9:09-CV-323, 2012 WL 1048463, *15 (N.D.N.Y. Mar. 28, 2012). Accordingly, the Court grants summary judgment in Defendants' favor as to Plaintiffs Breeden, Aiello, Daniels, Maxson, Mims, and Roesch's claims that they were denied access to counsel.[6]

## E.    Medical Indifference

Where the plaintiff is "not a sentenced prison inmate at the time the alleged deprivations occurred, the Eighth Amendment, which prohibits cruel and unusual punishment of those convicted of crimes, is not applicable under the circumstances." *Groves*, 2010 WL 1257858, at *6 (citing *Youngberg*, 457 U.S. at 312). Any claim arising from civil commitment must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *See Durham v. Jones*, No. 9:17-CV-434, 2019 WL 1103284, *4 (N.D.N.Y. Jan. 23, 2019) (citation omitted); *Williams v. Sykes*, No. 9:17-CV-990, 2019 WL 2374116, *2 (N.D.N.Y. May 10, 2019) (citing *Darnell v. Pineriro*, 849 F.3d 17, 29 (2d Cir. 2017)); *Groves*, 2010 WL 1257858, at *6 (collecting cases). Under this framework, the plaintiff "must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a 'mens rea prong' or 'mental element prong' — showing that the [defendant] acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29; *see also Durham*, 2019 WL 1103284, at *4 (collecting cases applying the *Darnell* test to civilly committed individuals).

---

[6] Including Mr. Nowicki and Mr. Fullem as defendants on this claim would not change the fact that Plaintiffs have failed to establish prejudice resulting the alleged denial of access to counsel. Accordingly, Plaintiffs' motion to amend the complaint is denied as futile as to this claim.

"Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the [individual] was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious." *Id.* "Under [] the . . . Fourteenth Amendment[], to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness.'" *Darnell*, 849 F.3d at 30 (internal quotations omitted). A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted); *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). Factors to evaluate the seriousness of a medical condition include "the existence of an injury that a reasonable doctor would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation omitted).

"In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. "[I]f the [individual] is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the [individual's] underlying medical condition alone.'" *Id.* (quoting *Smith*, 316 F.3d at 185 (alteration

in original)).  "When the basis for a [deliberate indifference] claim 'is a temporary delay or interruption in the provision of otherwise adequate medical treatment,' this [c]ourt examines whether the delay itself created a risk of harm."  *Valdiviezo v. Boyer*, 752 Fed. Appx. 29, 32 (2d Cir. 2018) (citing *Smith*, 316 F.3d at 185-86).  In considering whether a delay caused a risk of harm, a court may consider "[t]he absence of adverse medical effects or demonstrable physical injury."  *Smith*, 316 F.3d at 187 (citations omitted).

　　　To establish a claim for deliberate indifference under the Due Process Clause of the Fourteenth Amendment, the plaintiff "must prove that the defendant-official . . . recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35.  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious . . . harm will result."  *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).  "But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Defendants may "introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or non-existent."  *Id.* at 281 (citing *Farmer*, 511 U.S. at 844).  "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere.  Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable."  *Id.*  Finally, "[defendants] who actually knew of a substantial risk to [an individual's] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

### 1. Plaintiff Roesch

In the proposed amended complaint, Plaintiff Roesch alleges that Mr. Nowicki, Mr. Fullem, and Defendants Gray, Dawes, Bill, and Cebula acted with deliberate indifference to his serious medical needs by (1) denying him access to psychiatric treatment for his alleged claustrophobia while in the MOD ward, leading to his attempt to commit suicide; and (2) denying him access to his Transcutaneous Electrical Nerve Stimulation ("TENS") unit while on the MOD ward.[7] *See* Dkt. No. 153-13 at ¶¶ 196-207; Dkt. No. 153-25 at 16.

Plaintiff Roesch argues Defendants, by denying him access to his psychiatrist, interrupted ongoing treatment for claustrophobia. *See* Dkt. No. 153-25 at 16-17. Plaintiff Roesch further argues that it was this interruption that constitutes deliberate indifference. *See* Dkt. No. 153-25 at 17. However, Defendants deny that Plaintiff Roesch was undergoing treatment for claustrophobia, and, thus argue that triggering claustrophobia is not sufficiently serious to establish the objective element of a deliberate indifference claim. *See* Dkt. No. 148-1 at 19. This factual disagreement prevents the Court from deciding whether the inadequacy in medical care is sufficiently serious to establish the objective element of his medical indifference claim. *See Salahuddin*, 467 F.3d at 279. Plaintiff Roesch alleges that he told a non-party doctor that he was in distress because of his claustrophobia, but he admits that he did not have a diagnosis of claustrophobia. *See* Dkt. No. 153-22 at ¶¶ 57-60; Dkt. No. 155-3 at 5. Further, Plaintiff Roesch does not indicate that he told any of the named Defendants that he was in distress as a result of his

---

[7] Although Defendants characterize Plaintiff Roesch's deliberate indifference claim as including a claim for failure to prevent his suicide attempt, Plaintiff Roesch does not allege that the delay in treatment for his self-inflicted wounds constitutes deliberate indifference. *See* Dkt. No. 153-25 at 16. Regardless, the record indicates that Plaintiff Roesch suffered only superficial lacerations, which courts in this Circuit have repeatedly held are not sufficiently serious to support a deliberate indifference claim. *See Grays v. McGrain*, 333 F. Supp. 3d 225, 232-33 (W.D.N.Y. 2018) (collecting cases).

claustrophobia. However, while unclear whether Plaintiff Roesch's claustrophobia constituted an urgent medical condition, *see Franko v. Semple*, No. 3:17-CV-1558, 2017 WL 5709891, *3 (D. Conn. Nov. 27, 2017) (citations omitted), the Court need not resolve this issue because Plaintiff Roesch has failed to establish the subjective element of his medical indifference claim.

Plaintiff Roesch alleges that he told CNYPC staff that he was struggling with his claustrophobia and that he needed to see a psychiatrist but was denied such treatment. *See* Dkt. No. 153-13 at ¶ 197. However, as noted above, Plaintiff Roesch admits that he did not have a medical diagnosis of claustrophobia at the time. *See* Dkt. No. 155-3 at 5. At his deposition, Plaintiff Roesch claimed that while he was in the MOD ward, he asked to speak with a psychiatrist multiple times. *See* Dkt. No. 153-3 at 6. Yet, Plaintiff Roesch admits that he did not tell the treatment team how he was feeling or that he was in distress. *See id.* at 7. Apart from his self-serving and inconsistent statements, Plaintiff Roesch has not provided any corroborating evidence that Mr. Nowicki, Mr. Fullem, and Defendants Gray, Dawes, Bill, and Cebula knew, or should have known, that Plaintiff Roesch suffered from claustrophobia. Plaintiff Roesch's deliberate indifference claim arising from the alleged denial of access to treatment for his claustrophobia is insufficient because it relies solely "on conclusory allegations [and] unsubstantiated speculation." *Jeffreys*, 426 F.3d at 553-54 (quotation omitted). Indeed, Plaintiff Roesch has failed to furnish more than "[t]he mere existence of a scintilla of evidence in support of [his] position." *Id.* (quotation omitted). Accordingly, the Court finds that no reasonable trier of fact could find that Mr. Nowicki, Mr. Fullem, and Defendants Gray, Dawes, Bill, and Cebula

knew, or should have known, that Plaintiff Roesch suffered from claustrophobia and that placing him in a room with a closed door created a substantial risk of serious harm.[8]

Plaintiff Roesch also alleges that Mr. Nowicki, Mr. Fullem, and Defendants Gray, Dawes, Bill, and Cebula denied him access to his physician-prescribed TENS unit, resulting in significant back pain. *See* Dkt. No. 153-13 at ¶ 203; Dkt. No. 153-25 at 19. Accordingly, the Court must consider whether his back pain is a sufficiently serious condition such that denial of access to the TENS unit constitutes deliberate indifference.

While back pain can amount to a "serious medical need," the condition must be severe and long-lasting. *See Nelson v. Rodas*, No. 01-CV-7887, 2002 WL 31075804, *14 (S.D.N.Y. Sept. 17, 2002). Plaintiff Roesch, relying on *Jean-Laurent v. Lane*, No. 9:11-CV-186, 2013 WL 600213, *14 (N.D.N.Y. Jan. 24, 2013), *adopted* 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013), argues that denial of access to his TENS unit is sufficient for a medical indifference claim. In *Jean-Laurent*, the *pro se* plaintiff "described himself as having 'excruciating lower back pain' over an extended period of time." *Id.* Citing the plaintiff's level of pain and the length of time it lasted, and showing special solicitude to the *pro se* litigant, the court found that the alleged pain was a sufficiently serious medical need. *See id.* Here, however, Plaintiff Roesch alleges only that his TENS unit was prescribed to "treat his back condition." *See* Dkt. No. 153-13 at ¶ 203. When asked to describe how his back injury affected him, Plaintiff Roesch stated only that it was

---

[8] Alternatively, even if a jury could reasonably find that Plaintiff Roesch established both the objective and subjective elements of his claim, the Court finds that Defendants responded reasonably to the risk. *See Farmer*, 511 U.S. at 844. Although Plaintiff Roesch claims that he has attempted suicide on up to five occasions, these incidents occurred while he was in DOCCS custody. *See* Dkt. No. 153-3 at 2. Additionally, Plaintiff Roesch admits that he did not tell the treatment team that he was in distress or that he had cut himself, but that when a staff member noticed the blood, an emergency was called and Plaintiff Roesch received immediate treatment. *See id.* at 7-9.

"[p]ainful." *See* Dkt. No. 155-3 at 5.  Plaintiff Roesch has failed to indicate either the intensity or

duration of his pain.  Thus, Plaintiff Roesch's allegations related to the alleged denial of access to

his TENS unit are insufficient to survive summary judgment.  *See Nelson*, 2002 WL 31075804, at

*14 (finding that allegations of pain without a description of intensity or duration cannot survive a

motion for summary judgment in a deliberate indifference claim) (collecting cases); *see also*

*Berman v. Durkin*, No. 9:13-CV-136, 2017 WL 1215814, *15 (N.D.N.Y. Mar. 10, 2017) (finding

a bare allegation of back pain insufficient where the plaintiff did not allege it caused severe pain).

Regardless, Plaintiff Roesch has failed to establish the subjective element of his medical

indifference claim.  There is no indication that Plaintiff Roesch ever informed Mr. Nowicki, Mr.

Fullem, or Defendants Gray, Dawes, Bill, or Cebula that he needed access to his TENS unit.  In

fact, Plaintiff Roesch argues only that Defendants knew or should have known that Plaintiff

Roesch needed a TENS unit because they had access to his medical records.  *See* Dkt. No. 153-25

at 20.  However, Plaintiff Roesch has not demonstrated that his medical records clearly

established a serious medical need for his TENS machine or that Defendants knew of this need.

Instead, Plaintiff Roesch relies solely "on conclusory allegations [and] unsubstantiated

speculation." *Jeffreys*, 426 F.3d at 553-54 (quotation omitted).  Accordingly, the Court finds that

Plaintiff Roesch has failed to establish the subjective element of his medical indifference claim.

Defendants' motion for summary judgment on Plaintiff Roesch's medical indifference claim is

granted.

### 2. *Plaintiff Madden*

In the proposed amended complaint, Plaintiff Madden alleges that Mr. Nowicki, Mr.

Fullem, and Defendants Gray, Dawes, Bill, and Cebula acted with deliberate indifference to his

serious medical needs by depriving him of access to his Continuous Postitive Airway Pressure

27

("CPAP") machine for the first three days and nights in the MOD ward.  *See* Dkt. No. 153-13 at

¶¶ 190-195; Dkt. No. 153-25 at 20.  Defendants argue that this claim fails because the alleged

deprivation was not likely to produce death, degeneration, or extreme pain.  *See* Dkt. No. 148-1 at

22.  Defendants do not contest that the CPAP machine was medically necessary; rather, they

contend that depriving him of the access to his CPAP machine for such a short time did not pose a

substantial risk of serious harm.  *See* Dkt. No. 148-1 at 22-23; Dkt. No. 155 at 10-11.  Plaintiff

Madden, relying on *Sassi v. Dutchess County*, No. 9:16-CV-1450, 2019 WL 401951, *5-7

(N.D.N.Y. Jan. 31, 2019), argues that courts in this Circuit have found depriving a plaintiff of

access to a CPAP machine is sufficient for the purposes of a deliberate indifference claim.

In *Sassi*, the plaintiff brought a deliberate indifference claim based on denial of access to a

prescribed CPAP machine.  *Sassi*, 2019 WL 401951, at *4.  The plaintiff there provided a

professional medical opinion, to a reasonable degree of medical certainty, that detailed the harm

that resulted to the plaintiff when he slept without his CPAP machine.  *See id.* at *5-6.  Here,

Plaintiff Madden has provided no evidence other than his unsupported claim that he was "left

gasping for air as [he] attempted to sleep."  *Sassi* indicates that deprivation of a prescribed CPAP

machine can sustain an action for deliberate indifference where the plaintiff demonstrates that

without the CPAP machine, he is likely to suffer a serious medical event.  *See Sassi*, 2019 WL

401951, at *5-6.  Plaintiff Madden's medical records indicate that he suffers from sleep apnea and

uses a CPAP machine.  *See* Dkt. No. 154.  However, Plaintiff Madden has not established that his

sleep apnea was so serious that a failure to provide him with a CPAP machine rises to the level of

a serious medical event that would implicate his constitutional rights.  Plaintiff Madden's medical

records indicate only that he has unspecified sleep apnea.  *See id.*  Only once in his medical record

is a CPAP machine mentioned, and even there it is noted next to an indication that Plaintiff suffers "no apparent problems" with his respiratory system. *See id.* at 8.

Ultimately, Plaintiff Madden has provided no evidence regarding the severity of his condition, any complications associated with untreated sleep apnea, or corroboration for the alleged injury he suffered due to the deprivation of his CPAP machine. *See Santana v. City of New York*, No. 13-CV-3034, 2014 WL 1870800, *6-7 (S.D.N.Y. May 8, 2014). Plaintiff Madden's unsupported claims, without more, do not give rise to a triable issue of fact. Based on the present record, Plaintiff Madden's claims do no more than suggest "the mere existence of a scintilla of evidence in support of plaintiff's position[.]" *Jeffreys*, 426 F.3d at 553-54 (quotation omitted). Accordingly, the Court finds that Plaintiff Madden has failed to satisfy the objective prong for his deliberate indifference claim.

In the alternative, the Court finds that Plaintiff Madden has failed to establish the subjective prong of his deliberate indifference claim. Although Plaintiff Madden alleges that Defendants knew of his need for a CPAP machine, he alleges no specific facts that would indicate Defendants' awareness of the risk of harm to support the allegations. *See Perez v. Semple*, No. 3:18-CV-1697, 2018 WL 6435651, *3 (D. Conn. Dec. 7, 2018). There is no indication that Plaintiff Madden ever informed Mr. Nowicki, Mr. Fullem, or Defendants Gray, Dawes, Bill, or Cebula that he needed his CPAP machine. Rather, Plaintiff Madden alleges that he only informed unnamed staff of his need, and that this staff told him that he must wait until they could obtain a doctor's order for his machine. *See* Dkt. No. 153-4 at 4. In fact, the proposed amended complaint is devoid of any connection between the named Defendants and the denial of Plaintiff Madden's access to his CPAP machine. *See* Dkt. No. 153-13 at ¶¶ 190-95. Thus, the Court finds that Plaintiff Madden has failed to establish the subjective element of his deliberate indifference

claim.[9]  Accordingly, Defendants' motion for summary judgment on Plaintiff Madden's medical

indifference claim is granted.[10]

## F.    Free Exercise of Religion

Courts have long held that prisoners retain some measure of the constitutional protection

afforded by the First Amendment's Free Exercise Clause.[11]  *See Ford v. McGinnis*, 352 F.3d 582,

588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  "Balanced against the

constitutional protections afforded prison inmates, including the right to free exercise of religion[,

however,] are the interests of . . . officials charged with complex duties arising from

administration of the penal system.  *Id.* (citing *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.

1990)).  In examining a First Amendment Free Exercise claim, a court must determine whether:

(1) the practice asserted is religious in the person's scheme of beliefs and the belief is sincerely

held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3)

---

[9] Alternatively, even if a jury could reasonably find that Plaintiff Madden had established both the objective and subjective elements of his claim, the Court finds that Defendants responded reasonably to the risk.  *See Farmer*, 511 U.S. at 844.  At his deposition, Plaintiff Madden testified that he was given his CPAP machine after the second night in the MOD ward, but this delay was not unreasonable because staff needed a doctor's order to place the CPAP machine in the MOD ward.  *See* Dkt. No. 155-5.

[10] Plaintiffs' motion to amend is denied as futile as to this claim.  Plaintiffs' proposed amended complaint fails to even allege that Mr. Nowicki and Mr. Fullem were involved in the alleged deliberate indifference.  *See* Dkt. No. 153-13 at ¶¶ 189-207.  Regardless, the proposed amendments would not cure the deficiencies in Plaintiffs' claims.  Accordingly, Plaintiffs' motion to amend is denied.

[11] While the Second Circuit has yet to address the appropriate standard for civilly confined individuals bringing claims on First Amendment grounds, courts in this district have traditionally applied the same standards laid out in prisoner cases.  *See Yeldon*, 2010 WL 983819, at *7; *McChesney*, 2010 WL 3602660, at *12-13.  Additionally, neither party has suggested that the analysis for a Free Exercise claim by an involuntarily committed individual differs from the analysis applied to prisoners' Free Exercise claims.  Accordingly, the Court will apply the Free Exercise analysis used for incarcerated plaintiffs.  *See Lombardo v. Holanchock*, No. 07-CV-8674, 2008 WL 2543573, *6 (S.D.N.Y. June 25, 2008).

the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted).

A person "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. However, a court may not pass judgment on "the centrality of different religious practices." *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990)). Furthermore, an individual's sincerely held religious belief is "substantially burdened" when "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996).

Here, it is uncontested that Plaintiff Vanderpool practices Odinism. *See* Dkt. No. 148-2 at ¶ 89. Thus, the issue is whether Defendant Bill's denial of Plaintiff Vanderpool's request to attend the Neopagan festival at CNYPC after his release from the MOD ward substantially burdened his sincerely held religious beliefs.[12] Defendants argue that the neopagan festival was for Wiccans, not Odinists. *See* Dkt. No. 148-1 at 16. Because Plaintiff Vanderpool is an Odinist and not a Wiccan, Defendants argue that he was not "substantially burdened" by the inability to attend the festival. *See id.* Plaintiff Vanderpool, however, claims that CNYPC characterizes Odinism, Wicca, and other religions as "Paganism." *See* Dkt. No. 153-24 at ¶ 23. As a result, CNYPC

---

[12] Plaintiff Vanderpool had been released from the MOD ward at the time of the festival. *See* Dkt. No. 155-2 at 6. However, Plaintiff Vanderpool was on Program MOD at the time, which entails greater restrictions on residents' activities. *See* Dkt. No. 148-2 at ¶ 75.

offers only one festival for all forms of paganism.[13]  *See id.*  In his deposition, Plaintiff

Vanderpool characterized the festival as "Wiccan," but claimed that CNYPC does not offer a

separate festival for Odinists.  *See id.* at ¶ 24; Dkt. No. 148-11 at 3.

The Court finds that Plaintiff Vanderpool has failed to demonstrate a substantial burden on

the exercise of his religion.  Apart from his conclusory statements, Plaintiff Vanderpool has not

stated how the denial of the access to the festival impacted the practice of his religion.  *See* Dkt.

No. 153-24 at ¶ 25.  In *Krieger v. Brown*, 496 Fed. Appx. 322, 326 (4th Cir. 2012), the Fourth

Circuit affirmed the dismissal of a claim where the plaintiff claimed that he was denied access to

"sacred items [that] were 'necessary' to perform 'well-established rituals.'"  There, the Court found

that because the plaintiff did not identify any specific rituals or explain why the "absence of the

sacred items had an impact on the rituals and violated his beliefs," the plaintiff had failed to

demonstrate a burden on his religion.  *See id.*  Similarly here, Plaintiff Vanderpool has not

identified what the festival was or explained why denial of access to the festival impacted his

ability to practice his religion.  *See* Dkt. No. 153-24 at ¶¶ 23-25.  Instead, Plaintiff Vanderpool

relies only upon his conclusory assertion that "attendance of the festival was an important

religious observance of [his] faith."  *See id.* at ¶ 25.  This assertion, alone, cannot establish a

substantial burden.  *See Smith v. Governor for Albama*, 562 Fed. Appx. 806, 813 (11th Cir. 2014).

 Plaintiff Vanderpool's failure to provide evidence, or even allegations, establishing that

preventing him from attending the festival was "anything more than a mere inconvenience on his

religious exercise" is fatal to his claim.  *See id.*  Plaintiff has not provided any evidence from

which a reasonable jury could conclude that denial of access to the festival burdened his religious

---

[13] At the time, Plaintiff Vanderpool was not aware of any other residents practicing
Odinism at CNYPC.  *See* Dkt. No. 155-2 at 5, 8.

practice. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff Vanderpool's Free Exercise claim.

## G.     First Amendment Retaliation

Initially, the Court notes that prisoner claims for First Amendment retaliation are approached "with skepticism and particular care" because these claims are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001). In addition to speech, the First Amendment protects expressive conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff — namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action — in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). Even if the plaintiff alleges sufficient facts to demonstrate retaliation, the defendants may avoid liability if they demonstrate that they would have taken the adverse action "even in the absence of the protected conduct." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

The causal nexus between the protected speech or conduct and the retaliation must be specifically pleaded. *See Dolan v. Connolly*, No. 13-CV-5726, 2014 WL 1876524, *10 (S.D.N.Y. May 8, 2014), *report recommendation adopted by* 2014 WL 3057973 (S.D.N.Y. June 27, 2014).

In fact, the "allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.'" *See Davis*, 320 F.3d at 354 (quoting *Dawes*, 239 F.3d at 492). A court may rely upon several factors to evaluate whether a causal nexus has been sufficiently pleaded: "(1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary records of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive." *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006); *see also Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995).

Defendants do not contest that Plaintiffs' conduct in the dining hall was the justification for placing Plaintiffs on MOD status. However, Defendants contend that Plaintiffs' conduct, which Plaintiffs characterize as a peaceful sit-in, is not protected conduct under the First Amendment. *See* Dkt. No. 148-1 at 25. Further, Defendants argue that because the decision to place Plaintiffs on MOD status was made by Mr. Nowicki, the other Defendants did not take any adverse or retaliatory actions against Plaintiffs.[14] *See id.* at 24.

"The Supreme Court has held that 'in a prison context, an inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system[.]'"[15] *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (quotation omitted). Disrupts of the regular order within a facility are "plainly

---

[14] The Court notes that Plaintiffs Madden, Thomas, and Daniels withdraw their retaliation claim because they were not engaging in the protest. *See* Dkt. No. 153-25 at 26 n.7.

[15] Both parties indicate that First Amendment case law in the prison context is applied to individuals who are civilly committed. *See* Dkt. No. 148-1 at 25; Dkt. No. 153-25 at 26-27. Additionally, courts in this circuit have applied the legal theories from prison cases to claims implicating the First Amendment brought by civilly committed individuals. *See, e.g., Balkum v. Sawyer*, No. 6:06-CV-1467, 2011 WL 5041206, *5-6 (N.D.N.Y. Oct. 21, 2011); *Yeldon*, 2010 WL 983819, at *7-9.

inconsistent with legitimate objectives of prison organization." *Id.* "Entreaties to such activity, like 'petitions protesting prison conditions' are not entitled to First Amendment protection where other less disruptive means of airing grievances are available." *Id.* (internal quotation omitted). "[W]here a prisoner's conduct violates a reasonable prison rule or regulation, he has not engaged [in] protected conduct and cannot state a constitutional claim if he is disciplined for violating that rule or regulation by engaging in such prohibited conduct." *Bacon v. Phelps*, No. 9:15-CV-1508, 2017 WL 4220465, *4 (N.D.N.Y. July 6, 2017) (citation omitted). Participating in a prison riot is not protected conduct. *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, *19 (S.D.N.Y. Mar. 26, 2008) (citing *Pell v. Procunier*, 417 U.S. 817 (1974)).

In *McFadden v. Friedman*, No. 9:12-CV-685, 2015 WL 5603433, *15 (N.D.N.Y. Sept. 23, 2015), an inmate was disciplined for disobeying a direct order. Because the plaintiff did not deny the underlying misconduct, the court found that the disciplinary action was not retaliatory. *See id.* The court found that "[i]f plaintiff disagreed with the order given, he 'had the opportunity to exercise his First Amendment rights to criticize prison rules through other means than disobeying the direct order." *See id.* Similarly here, Plaintiffs were initially placed on MOD status because they denied the orders of staff to return their trays and utensils. *See* Dkt. No. 153-13 at ¶¶ 214-15. While Plaintiffs claim that they were attempting to express their discontent about CNYPC staff's counting of utensils, the appropriate action would have been to follow the grievance process in place at CNYPC, not disobeying direct orders from staff.[16]

---

[16] Notably, although Plaintiffs decided not to utilize the grievance process in place at CNYPC, they are clearly knowledgeable about the means of challenging actions taken by CNYPC staff, as evidenced by their discussion of the filing of this law suit. *See* Dkt. No. 152 at 3:04:40-3:06:40; 3:59:30-3:59:55 (one Plaintiff stating "File a 1983. . . Federal law suit").

As discussed above, Plaintiffs' conduct violated CNYPC rules. *See* Dkt. No. 149-1 at 7. Plaintiffs created a disturbance that resulted in a disruption of normal CNYPC functions and in a stand off between Plaintiffs and CNYPC staff that lasting more than eight hours. This conduct, regardless of Plaintiffs' intentions, disrupted the treatment of all of the residents on the ward and is not constitutionally protected. *See* Dkt. No. 149-1 at 7 (defining a riot as "any time two or more residents are together and cause a disturbance that results in disruption"); *see also Bacon*, 2017 WL 4220465, at *4. As in *McFadden*, Plaintiffs chose to disobey staff direction and violate CNYPC rules rather than utilize the grievance process available to them. Thus, Plaintiffs were not engaging in protected conduct and the placement of Plaintiffs on MOD status was not retaliatory. Accordingly, Defendants motion for summary judgment on Plaintiffs' retaliation claim is granted. [17]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 148) is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' cross-motion to amend their complaint is **DENIED**;[18] and the Court further

---

[17] Adding Mr. Nowicki and Mr. Fullem as defendants would not cure the deficiencies in Plaintiffs' claim. Accordingly, Plaintiffs' motion to amend is denied as futile with respect to this claim.

[18] The Court notes that Plaintiffs have also had numerous opportunities to cure the deficiencies in their claims. The proposed amended complaint would have been their fifth pleading, three of which were filed with the assistance of pro bono counsel. Thus, denial of the motion to amend is justified in light of Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed[.]" *Foman*, 371 U.S. at 182.

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 26, 2020
      Albany, New York

Mae A. D'Agostino
U.S. District Judge